The next matter is case number 15-1542 United States v. Joseph Burhoe and case number 15-1612 United States v. John Perry Good morning, Mr. Schneider Good morning, Your Honor. My name is Michael Schneider and I represent Mr. John Perry. I would like to reserve, if I could, three minutes for rebuttal. You may. I would like to begin by focusing on the evidence regarding the legal sufficiency of the extortion of human members. Fundamentally, the government's case on this rests on some pretty profound misunderstanding of the 2003 rule and to what extent it actually represented a rule that produced any kind of legal entitlements to the members at all with respect to any wages and benefits. The rule clearly was not binding. The rule itself indicates that it had a loophole for the employers to determine whether or not, first of all, for human officials, but then also for the employers to determine whether or not the applicants, the spares, were suitable for employment. And secondly, the attorney who drafted the rule made it clear that the 2003 rule was really meant to be a statement of preferences and not a binding seniority provision. But even if it was somehow binding, it was not the kind of seniority provision that the government cites in its brief with respect to the Humphrey and Wood cases where you actually have a list that's attached to a part of a collective bargaining agreement, an appendix to a collective bargaining agreement, that records the members in terms of their seniority. The rule simply provided for preferences for those who had worked in the industry before April 1st of 2003 and, therefore, it didn't give any of the dissidents, any of the spares, any particular right to a spot or a place on the hiring line, as the government has now reformulated its argument. In addition, even under this reformulated notion that what the alleged victims in the hearing were deprived of was a favorable or advantageous place on the hiring line, it seems pretty likely that that is not, under SECAR, obtainable property under our notion of extortion. I'm just going to add, that's one of the odd things about this entire case. We are so far from the paradigm of what the New York State Field Code's notion of extortion was, that it involves a threat of some sort of violence or a threat that induced some sort of fear, that induced some consent, that in order to obtain something really concrete of value that was attainable and transferrable. And that's why I would suggest the government has decided to abandon the SECAR issue altogether. But even if you're looking just at the way the government's wages and benefits theory as they reformulated them, what we're now talking about is some sort of favorable spot on the hiring line. But, again, it's just being put into a pool of spares who had pre-2003 trade show experience. In addition, there is no evidence to actually regard that as property. Is it relevant whether they abandoned it or whether your client just took it using the powers that he had as a practical matter? Well, I mean, one of the huge issues with any extortion case is whether the threats were used to induce consent. I don't think there's any evidence that any of the spares that were complaining about the 2003 rule and its application and elimination ever consented to any taking of property. And as we pointed out in our brief, the induced consent is precisely what distinguishes extortion from harzak robbery. So I'm not sure how you even conjure up a theory. And they put together sort of a new branded theory in their brief suggesting that if somehow Edwin Flowney persisted in returning to work in order to earn the wages that he felt that was due him under the 2003 rule, that he would be beaten, that that now has become the object of the conspiracy. I don't think a rational jury could have found that that's what occurred on September 19th, the day that Flowney learned that he had been indefinitely suspended from the ACCA facilities, that the object of this threat was to keep him from persisting in insisting on a spot under the 2003 rule to earn some wages. As I say, we are so far from the world of the New York Field Codes extortion act. And this may be a reason why we've seen so few cases of this sort on the books. It's something that the Supreme Court noted in the Edmunds case that there have been a dearth of cases over a two-decade period. And we took it as some movement to suggest that maybe this is not the kind of case that the Hobbs Act extortion was designed to take account of. Another thing was that there was no evidence that Mr. Perry obtained or attempted to obtain any particular spot from someone from when one could imagine a situation when that might be the case. If you were Edward Flowney under a different kind of regime, not the 2003 rule, and you were ranked number three on the list, and Perry said, if you don't keep quiet and not oppose me at union meetings, I will take your number three spot and I will give that to my brother Joe, then the government would have a plausible case for obtaining it. Because under those circumstances, Am I missing something? I thought there's no transferable property interest in it. Well, I think there's one thing. If there were some sort of union entitlement that were written on a piece of paper that was part of an effective bargaining agreement that said, you are entitled to all jobs. But that's not the key thing of passing a transferable property interest in my mind. It does have to be. Not all unions are entitled to a transferable property interest. That's correct. It's your argument that there's a transferable property interest. My argument is not that. I was making an even-ended argument. I was saying, even if you were to do this transferable, it would only be transferable if the 2003 rule was really a binding seniority, it could theoretically at least be, a binding seniority contract that actually entitled people to be the number three hired. And if Perry, or Burkhart, or one of the defendants had specifically said, I'm taking your number three spot, which entitles you to all jobs at a particular company, and I'm giving this to John. But here's what I was trying to figure out. Because I don't want to be tempted to show that. The fact that he could give the number three spot to someone else does not mean the spot was transferable. Is that right? Or is that wrong? I would have thought that just means it could be taken away somewhere else, because I thought transferable means the person in the line could say, I'm giving my number three spot to John if Perry wants me to hire him. Yes, I'm just suggesting the government case would be a hundred times stronger with that kind of a seniority provision, and it simply isn't. But I do think there are several obtainability and transferability problems with this notion of the deprivation of an advantageous spot in the hiring line. But a deprivation is not an obtaining or an attempting to obtain, and the courts have made that quite clear, and it's certainly clear in SECAR. I'd like to address the extortion claim as directed to the employers. Sure, I'd be happy to. With respect to the employers, one of the huge issues throughout the trial was whether or not the jobs that were obtained had to be real jobs that were performed. And if you look through the series of questions that first the prosecutor posed to witnesses and then defense counsel posed on cross-evaluation to witnesses, what came out was something that the government essentially argued in its closing argument, and this became a critical issue there, was that it simply didn't matter whether the jobs were real. The prosecutor said as much in the closing argument. It didn't matter if the jobs were real so long as the business did not want or need the union labor. That was the government's position. And the defense throughout the entire trial disputed that and asked questions of witnesses designed to show that there were real jobs that were obtained by the union members and that in fact were performed. The defense requested a specific instruction that not only had the endman's end fictitious language, but they also asked the judge to charge that the government must prove the unreasonable doubt that the business did not need anyone to perform the jobs in question, union or non-union. And the judge simply refused to give that instruction. When you look at the jury questions from day two all the way through day five, and I put them in the addendum of both my main brief and the supplemental addendum to the reply brief, you'll see the jury asks a series of questions saying, do we, are we free to use the word, to interpret the word superfluous as we see it? What if the vendor simply did it to avoid disruption? What if the vendor had already paid other workers to do this work? What if the vendor simply believed it and asserted that it was superfluous? Do we have to take the vendor in his word? And the judge essentially declined to give any further clarification. And I just don't think we would submit that that's not what the law requires. And it's, you know, kind of a complex sequence of things that you need to look at, but certainly you need to look at endman's and his interpretation beyond that. You asked for instruction on fictitious, is that right? And fictitious. Yeah, and beyond that, did you ask for clarification about what superfluous meant? There was a specific request for that the government must prove that, that the business did not need anyone to perform the labor services in question, union or non-union. That is relevant to the issue of what superfluous meant. Okay. You said there was one question, which is, does it matter whether they want to hire people to do these jobs? Did you say that? Hire them and hire them when they can. Did you ask for clarification about whether that mattered? There was a repeated request. That sounds different than the question of whether anyone was needed to do the job at all. That sounds more like fictitious. I really would like to also focus on the specific features of Mr. Perry's case with respect to the sufficiency of that. The government never presented, all they presented was evidence from the Premier of Technology Services, the audiovisual service event planner, that basically he had been fully staffed prior to the union's approach and request to have union members do the work of the non-union members. And the government never presented any evidence whether he, in fact, or Mass General had paid any other non-union workers to do the work, whether they, in fact, showed up, whether they, in fact, did any work. And I would submit that that is an important feature here, where the most critical thing is that at least with respect to the Mass General event, there was clear evidence that the defendants did the work, they did four hours of work, they were paid at regular union rates, non-extortionate rates, $50 an hour for four hours. They were paid through a form of invoicing process that Mr. Perry openly signed off on, and they were paid by check. This is not a payoff, and this is not an exaction of wages for services that were not performed or not to be performed. And I would submit that in order to kind of construct what an appropriate rule in that context would be, you would not only need to look at the sweeping language and endings that delimit the application of the Hobbs Act in the labor context, but that you need to look at something the government notoriously does not cite in its brief, which is section 1951C, which basically says that nothing in the Hobbs Act is designed to modify or affect the National Labor Relations Act. It would mean to look at 86 of the Taft-Hartley provision regarding unfair labor practices by labor organizations, which limits as an unfair labor practice only one specific federal practice. I'm glad you brought that up because I've been thinking about that all along. Were there unfair labor practices charges filed in connection with this whole situation at any point by anyone? To my understanding, there weren't on that point. There was an unfair labor practice filed against Mr. Perry for not properly processing the grievances, and the NLRB and its appeal unit kicked that out and basically dismissed those appeals. Basically, I may be off at the wrong tack here, but maybe you can help me. Would you say that what was at issue here was federal betting? Are you familiar with that term? I'm familiar with that term, and there's a large literature on federal betting. One of the cases that we didn't cite is a companion case to the Gamble case, which we did cite, a 1953 case, called the Market Newspaper Publishers. I can send a 28-J letter to amplify on this. But it goes through the Legislative History of Section 86 of the National Labor Relations Act. It prohibited federal betting, and it only prohibited a very narrow type of so-called federal betting, which is the exacting of payments for jobs that are not performed or are not to be performed. If you look at the legislative history as the Supreme Court discusses it, it's very clear that that is the only form of federal betting that Congress was choosing to deem an unfair labor practice. And I would submit that that has got to mean something in terms of how the Hobbs Act in the labor context can be applied to something that occurred here, which is unions doing what unions do best, which is making efforts, in this case nonviolent efforts. I think the government's suggestion that Mr. Perry engage in anything resembling violence, with the exception of a bump on the shoulder involving one of the union members, but with respect to Mass General Hospital, there's no indication that he did anything remotely violent. He simply said, you're not getting out of here non-union, and otherwise our people will come down and picket. And one particular document that I would suggest would be really worth a close look at is Exhibit 13.5, which is a letter that the Westin Hotel sent to its vendors and event planners. It basically said the union was engaged in a citywide campaign to become the preferred union of choice in terms of doing loading and unloading, and it was engaging in a campaign to get jobs. Well, that's what unions do. They try to get jobs for their members. And I would submit that that's what occurs here. And to the extent that the National Labor Relations Act doesn't deem this to be an unfair labor practice, I don't think the Hobbs Act should be stripped from the traditional context that it originally emerged in and then apply to this labor context something totally different. I think Congress has said, or the Supreme Court has said in investigations, that's what should be defined. Let me just, since the vetting has just come up, let me just understand. There's three possible cases, and I just want a quick sense of how you treat each one. So, a fictitious job, union pickets and demands that you pay us for a job that doesn't exist at all. You agree that's problematic. Yes. Okay. Flip side, the employer puts out a notice, I'm going to hire a bunch of people. I haven't hired anybody yet. Union comes and says, you're going to be hiring union people, otherwise they're going to picket. I take it you say that's totally fine with the Hobbs Act. Yes. Okay, third case, employer has hired and is paying a bunch of non-union people. Union shows up and says, you obviously need that work done. I know you hired people, but you're going to have us do those jobs. If that means firing them, you fire them. Otherwise, we picket. Is that okay or not okay? That is not an unfair labor practice, and the Hobbs Act should not be butting in and deeming it to be a criminal offense. Because Congress made a determination that if you need to work on this type of publishing, which we didn't, that's made work. That's people making duplicate forms in the publishing industry. It was acknowledged by everyone. So and so used in that case. That was made work that didn't need to happen. But the court held that under 826, that was work that was actually done, and not an unfair labor practice. Isn't what Judge Behrens described essentially the facts in Vocal 807, where the Supreme Court in Emmons then tells us that the statute was intended to criminalize precisely that contract where the teamsters stopped the trucks. They already had drivers, and the teamsters said, you've got to hire us, and then some of them drove the trucks into the city. That seems to be the third scenario Judge Behrens is stating. Vocal 807 and the Tenwood case are both categorically different because they do involve acts of violence and threats of violence. And that's not the case here. O'Shea recently talked about it. That's a different point. Now you're trying to talk to me. I do understand that. I think it's also relevant here because I think violent cases are categorically different. Just bragging that. Just put that aside. But if you read Vocal 807, essentially it's like what you've done. Some of the truck drivers, the unionized truck drivers after receiving the payments, simply drove off and didn't perform any work. I think it's somewhat after the trucks went into the city, if I understand the facts. Right, but I would say I would submit it would be the latter, the truck that I'm describing, that was ultimately something that indicated that these really were akin to payoffs. Or, as Justice Stone said in his very well-articulated dissent, these were payments for removing from violence. So you're saying you should read Emin's description of Local 807 as saying Congress wanted to criminalize some components of the behavior there, not the behavior as I've just described it. No, not all of the behavior. And I think part of it was that some of the truckers there simply were not performing services that were paid for. That was also a day's wages. That was $10. That was for the entire day. It was not for the hours that supposedly they were to go in and do the work. Now those were excursional wages in those days. And I think that's considerably different here where the union members were paid $15 an hour for four hours of work. Why would you distinguish forcing the employer to pay twice for job X as opposed to paying once for non-existent job X? Under both situations, the employer really is getting something, getting nothing for something. It's fictitious and superfluous. Well, I think Congress, I mean American Publishers actually addresses why AP6 only finds one to be an unfair labor practice and not the other. So I think that would certainly be worth the close reading looking at this. Thank you. Thank you. Ms. Conrad, good morning. Good morning, Your Honors. Miriam Conrad here. Joseph Bernhardt with me as Ms. Meisner was also in the brief. I would like to reserve two minutes, three minutes, excuse me, for rebuttal. Go ahead. Picking up, if I might, on some of the questions that were just asked about Edmonds in particular. First of all, I just want to emphasize that this case really is, if not unique, certainly at the outer edges of cases that have been prosecuted involving the Hobbs Act and labor unions. In that it involves, notwithstanding a government somewhat strained argument in its brief, it involves threats to picket, protected labor activity, and it's being prosecuted under the Hobbs Act. The Hobbs Act, which 1951c, specifically says it does not modify, repeal, or affect the certain labor statutes, including the National Labor Relations Act. The National Labor Relations Act, in turn, addresses when picketing is an unfair labor practice and addresses when, basically, outlaws federal debt, as Your Honor asked about. So, looking, first of all, to Judge Torreira's decision in Tamberello, which was also cited in our briefs, which granted with a civil motion to dismiss a civil Hobbs Act extortion complaint and held that when something arguably falls within the realm of the National Labor Relations Act, it cannot be the subject of a Hobbs Act claim. Now, we're not making a jurisdictional argument here, but we are saying that in this case, where what was at issue was picketing and only picketing, that is exactly the type of protected activity that the Hobbs Act does not reach. You can't mean that literally, because that would extend even to fictitious jobs. Well, I'll get to that in a minute. But the reason, the difference between picketing and violence is different, because certainly the National Labor Relations Act does not cover violence. But with respect to fictitious acts, with respect to picketing, then you run into United States v. Stern, because then you're talking about whether or not the defendants knew that they did not have a claim of right to those jobs. And I think the evidence, which I can address in more detail, clearly is insufficient to show that they did not believe that they had a claim of right. When you look at the 13.5 letter that Mr. Schneider cited, when you look at the open discussions with the security guard at the Western Waterfront Hotel and so forth. But my point is that the National Labor Relations Act defines what feather bedding is, defines what unnecessary, unwanted, superfluous, and fictitious jobs are. And that was not in this trial. Instead, if you look at the questions the jury asked, the jury repeatedly asked for guidance on unwanted, unnecessary, and superfluous. In fact, I think the question was not if they hire someone, if they've hired someone already, then is it unwanted, unnecessary, and superfluous. What they asked was if they've already hired someone, is it reasonable to conclude the vendor would have to fire their own workers, and is that illegal? Now in the Kirsch case, the Western District of New York held that where the owners of the company had fired their workers in order to hire union members, that that was not sufficient evidence under the Hobbs Act. Because the question is not whether you have to, whether the workers are unwanted, unnecessary, and superfluous. The question is whether the work itself is unwanted, unnecessary, and superfluous. And that theme, which is brought into focus by Kirsch, runs through all of the cases, and it also is in 158b-6 of the National Labor Relations Act, which addresses Satterbay. The government's view at trial, and arguably on appeal, is, well, if the non-union companies did not want to hire union workers because they'd have to pay them more money, presumably, or because they'd already hired somebody, at much lower wages. And by the way, in at least two instances, they hadn't hired, in the way that we understand that word, anybody. In the Four Crates situation, they were using volunteers who were compensated with free beer and T-shirts. And in the Great Bridal job, they had hired and found independent contractors on Craigslist, and the owner, Walter Mills, or the manager, acknowledged that they were paying far less than what the Teamsters were. If it was an unlawful labor practice, or, more significantly, in violation of the Hans Act, to go to an employer who says, you know what, I don't want to hire Teamsters because I'm going to have to pay them more money, that would undercut the entire nature of what the labor union movement has done, which is to use legal economic pressure to get employers to hire union members at higher wages than what they're already paying. So to say, well, that's extortion because they don't want to hire them. I understand the theory, but how exactly was Evans given that it sounds like a lot of what you're saying could have been said about Evans, to the extent that it would suggest that the picketing there would have been wrong? Well, in Evans, in fact, what the Supreme Court held was that it was lawful for the union members to use violence and threats of violence in the context of a collective bargaining dispute and a labor dispute. So I don't think it's at all confusing. This is the one with the truck where they forced them to come over and compete in the case. That's 807. 807 is very confusing, and the discussion in the eminence of 807 is very confusing because they cite what some people in Congress, in enacting the Hobbs Act, said about 807. And it was characterized, as Mr. Schneider said, as saying we're going to drive this truck across the city line, or they said we're going to just give us the money and we'll take off. So it's not clear what the evidence in 807 was, and it's even less clear whether Congress had an accurate view of what the evidence in 807 was. But 807 had one important distinction, which is it involved violence. It involved actual and threatened violence, which this case does not. But to the extent 807 defines the universe of unwanted, unnecessary, and superfluous, of course, we're not in a position of reviewing that trial transcript to say, oh, that was sufficient evidence on which the jury could conclude that these were basically payoffs. But if they were payoffs, that would distinguish that case from this case. But the fact that there's violence, and therefore there would not be a claim of right, and there would be with respect to picketing to conduct that. The other important thing to remember about 807 is because it was the Anti-Racketeering Act, there was no reference to the National Labor Relations Act. And by 1951C, referring to the National Labor Relations Act, one could say that it basically incorporates the National Labor Relations Act in terms of defining what would be unwanted, unnecessary, and superfluous. Because it would really be a very odd turn of events, and I would suggest certainly go far past any notion of fair warning or due process that we would have if the Hobbs Act makes it a crime to do something that the National Labor Relations Act does not deem to be an unfair labor practice. So if it's not an unfair labor practice, then how can it possibly be the basis for a criminal conviction? I would like to turn for a moment to the issue of the alleged union member extortion counts, which as to Mr. Burhoff, there are only two counts of which he was convicted because he was acquitted of the two counts related to Edward Friere. Those are the union, excuse me, the GES vote in 2009, and the alleged extortion of Robert Wellman. The government's shift from its overwhelming theme at trial, which was extortion of rights under the LMRDA, to now a theory of wages and benefits, I would suggest, should not be countenanced. Because as Mr. Schneider argued, the basis of a Hobbs Act prosecution has to be that the alleged victim gave up something that was transferable property through threats that induced consent. And there was no evidence in this case that the union members gave up their right to wages and benefits consensually because of threats by the defendants. I would also argue that with respect to the GES vote, there's simply insufficient evidence that Mr. Burhoff participated in any way in or committed extortion, where he was merely standing at a gate and called two members beforehand and told them there's a vote and you should come down. The government's theory was always that the defendants manipulated the GES contract vote. Manipulation is no more extortion than interference was in Shiver, nor does it involve extortable property. The reason the government has shifted, I would submit, is because Sarkar doomed the LMRDA theory. And as a result, they have to seize on something. But as Justice Alito said in his concurrence in Sarkar, the fact that something might have a future economic effect does not convert it into extortable property. And that's really what the government's argument is. They're very attenuated. If he gave up, if they gave up their right to vote, then they might lose the 2000 jury limit. And the evidence translates that they gave up their right to vote as opposed to were prevented from voting. And so, too, with Robert Wellman, where there was nothing about wages and benefits. It was a promise of economic benefit or reward if he were to sign an affidavit. And the government tried to convert that into being a witness, which they tried to convert into LMRDA rights. And so I would submit that the government's theory simply cannot survive. The LMRDA rights at issue were not extortable property as the government seems to now concede. And the wages and benefits were not the subject of any extortion in this case. One more thing. I would just note United States v. BACA in the context of Nelford. Can I finish? In the context of Nelford, United States v. BACA talked about labor rights. And an internal labor dispute said that the fact that there is economic benefit associated with property does not make it into property that can be the subject in a Nelford prosecution. Thank you. Thank you. We're going to take a brief break at this time. Then we'll hear you. All rise. Thank you. Thank you. Law School of the United States. I'll begin this morning by addressing the defendant's challenges to the sufficiency of the evidence underlying their conditions for extorting or attempting to extort their fellow union members. But before I do get to the specific counts, I want to make one fundamental point that relates to these counts. And that is that in the union context, seniority and work and wages go hand in hand. The Supreme Court recognized that in Humphrey. The Second Circuit recognized it in Grove. And we see in this case by the extent to which the victims went to protect and vindicate their seniority rights. Because they knew that those rights gave them the best opportunity at earning wages. And so now turning to the individual accounts, when James Lee, for example, files the grievance in October 2008 claiming that GDS was hiring in violation of the 2003 rule and seeking to be made whole for wages and benefits due. And John Perry assaults him in the union hall. There I have the job site in front of other members. The jury could have reasonably inferred from this evidence that Perry was presenting Lee with a choice. Give up your wages or else I will have you beaten. The opinion comes in. Isn't it slightly different than give up your wages you haven't yet received? It is to be sure and claim a future wages. So how does that fit with the statutory requirement about property? The answer to that is because future wages constitute a cognizable property interest under the Hobbs Act. And I think the best case to look for that proposition is the court's decision in CCAR. Both the majority of the concurrence will incite the Ninth Circuit's decision in Zemeck. Which is a case about, an extortion case about firebombing a competitor. And the court there describes the property interest, the majority describe it as goodwill and customer revenues. And Justice Scalia says that may well be a proper property right under the Hobbs Act. Justice Alito, in his concurring opinion, which is all about what constitutes property under the Hobbs Act, identifies the property right there as customers and treats that favorably. Now if on the business side, a business has a cognizable property right in future business and future revenue, to which they may not have a contractual or statutory right, but if it works on the business side, it has got to be the case that an employee has a cognizable property right under the Hobbs Act to future wages. But Ted, you mentioned Lee, after the chest bump, because I understand that Lee went ahead and contacted GDS to try to get hired. That's correct, Your Honor. And the reason he didn't get hired is apparently in dealing with GDS, wouldn't enforce Lee's interpretation of the 203 agreement. Of the 2003 one, Your Honor? Yes. I think that's where the evidence is. That was certainly under the influence for the jury to draw. Correct. That, to me, doesn't even begin to sound like extortion. I think there's a lot of good point here. But just explain to me how what I just described to you is extortion. Under your theory, what has to happen is there's the chest bump. Lee's going to go get his job. He's going to go assert some seniority right. Terry comes along, chest bumps him, and he therefore says, I don't want to be chest bumped again, so I won't go to GDS. And then, under your theory, he surrendered the job and someone else gets it. But the hinge to even talking about extortion here is that because of the chest bump, he says, well, okay, I'll surrender my rights. Here's the answer to Your Honor's question. And it is that the Lee count, like every substantive extortion count in this case, was charged both as a completed offense and an attempt. And this court has made clear that in an attempt to extort case, it is not relevant. The government does not need to show that the defendant actually obtained the property right. What the government has to show is an attempt to generate fear in the victim. So the extortion with respect to Lee is complete at the moment that Terry assaults him. Okay, when you talk about force and assault and fear, because I understand that we have a union of roughly 7,800 members over time, roughly, and we're talking about years. When I go through the evidence, what I accumulate out of that is a punch in the face in a bar fight, a chest bump, and someone grabbing someone's arm. Have I missed any of what you refer to as the violence by the union here? Well, I think, to Your Honor's question, there's more evidence of violence. So, for example, when Joseph Berho walks Robert Wellman to the union hall to sign the affidavit in the spring of 2009, he's talking to Wellman about the bullet wound and knife wound on his body, talking about the violations. So if someone tells a story about their wounds, that's your fourth thing. Well, I think it just seems to me, counsel, if we're talking about 800 union members over many years of time, and this is what the government's come up with, that it talks about assault and fear and violence, I find it hard to imagine any gathering of 800 people over time that you wouldn't get a chest bump, a grab on the arm, and maybe a bar fight between two people. Perhaps this is a better way of considering the issue, Your Honor, if I may. The individual extortion counts against the non-union members charge discrete acts by the defendants, discrete attempts to generate fear in the victim in order to obtain future wages. And so, regardless of whether there was a mass culture of violence in the union or not, or whether the defendants attempted to generate fear across the membership, and I think there's substantial evidence that that's true, as to James Lee, that particular count, the relevant question is whether Perry attempted to get Lee to give up future wages under threat, that if he didn't, he would again be beaten. But your whole theory is that because of this atmosphere that you refer to as violence, and because of other conduct of the people, we should view a chest bump as trying to induce that fear that would cause someone to do something. And that sounds, on this record, if you get chest bumped by someone who their last ten chest bumps, they then had someone beat up, that's one thing. But if you get chest bumped, and you've got this record, and it clearly didn't deter the guy at all, how do you find that that was an attempt to use violence to get him to do it? One way of thinking about it, Your Honor, is just to emphasize that we're here on sufficient theory, and so really the relevant question is could any reasonable jury have concluded that when John Perry assaulted Lee in connection with agreements, that Perry was communicating to Lee, give up your wages or you'll be beaten? Again, I think that's the relevant question, and perhaps the only relevant question with respect to the threat to induce James Lee. Now whether James Lee was actually afraid or not is also irrelevant. We know that from cases like Wood Oak, for example, where the court said whether the victim actually felt fear is not relevant in an attempt to, well, it's not that it's not dispositive of whether there was an attempt to induce fear. It may be relevant. Beyond the actual physical contact, is there anything else that gives us insight into what may have been intended with respect to James Lee? We know from the hours records from James Lee that his hours dropped precipitously after the incident with John Perry. So he was working three hundred and fifty hours a week. By the one who's doing the assaulting. So that would be John Perry. I'm not sure I follow Your Honor's question. Well, there's contact between Perry and Lee. And you say you could deduce from that contact an intent to communicate a threat. That this will happen to you again if you don't do X. I'm saying the jury couldn't do X. Aside from the contact itself, is there anything that gives us insight into Perry's intent that would also give some support to the jury concluding that that's why he was bumping into him? Well, I think the hours records support at the very least the notion here that Perry had control over the hiring and had the ability to see to it that James Lee would not work. So why didn't you just bump him? Excuse me, Your Honor? If Perry could do it on his own, why do you need to just bump him to get Lee to surrender it? Well, I think that would require reading more into the internal thought process of John Perry than a Haas Act requires. But you've got to read some of the questions. You're asking us to conclude that a reasonable jury, beyond a reasonable doubt, could read into the thought process of Perry when he bumps into Lee. You have to. It's not bad. It's just what you have to do in order to defend the verdict. So then we're just asking you what would lead us to read into the thought process so that we can conclude a rational jury could, beyond a reasonable doubt, conclude that his thought process was to communicate a threat to get him to surrender future wages. And as far as I can tell, what you're saying is the only things that are there are the fact of the contact and the fact that you need to use the contact to get him to surrender the wages. Well, it was to Your Honor's latter point that I was responding. Whether Perry had alternative ways of seeing to it that James Lee would not work for GES and then redirecting that work to others is, in some respects, I think, beside the point. I think the rational jury could be a little unhelpful to your case. I don't know that it's unhelpful to our case. It can't be helpful to your case. Perhaps it's not. So all we have is the contact itself? The contact itself is a suspicion. And I want to make sure it's clear. This is Perry. There was a criminal complaint taken out against John Perry in connection to our case results in the lead. No cross. But this was not an incidental bump. This was John Perry, witted that James Lee had filed the grievance and intentionally created contact, almost knocking Lee over. And really, the bottom of the question there is, again, could a reasonable jury have inferred that when Perry did that, there was no deceit that he did it? Could the jury conclude that when he did it, he was signaling to Lee, Give up your work. Give up your claim to future rights, or you will be beaten. You mean give up the work that I can unilaterally take away from you whether you want or not, and leave it and give it up? Well, it's certainly easier for Perry to get Lee to not try to vindicate his rights than it is to deal with a dissident union member who is trying repeatedly to exercise these rights. After all, Lee filed a grievance in October of 2007 about making the same claim. He said something just a second ago. I just want to understand why this wouldn't be an equally, if not more, plausible inference to draw. That he assaulted him because he was the witness. That's not extortion, correct? That's not extortion, Matt. That would be intent. I'm really mad, and I'm literally mad. And I admit it. I have not committed a hostile violation. I think without more, probably, knowledge to how to disrupt it, Lee doesn't say that it would be rational for a jury beyond a reasonable doubt to conclude that the reason there was contact was because Perry wanted him to surrender future wages, which he couldn't prevent him from getting otherwise, rather than that he was livid at Lee's asylum grievance. It would perhaps be an available inference for the jury to have drawn that this was retaliation and not extortion. The district court specifically instructed the jury that retaliation did not suffice, that the jury had to find an attempt to obtain this property under consent. And so where there are, to your Honor's point, where there are competing inferences that can be drawn, so long as both of them are reasonable on sufficiency review, it is to construe the evidence and draw all reasonable inferences in the light most favorable to the verdict. And I think the verdict here on this count rests on what we see as a fairly well-rounded understanding that when someone beats someone for seeking to vindicate a claim, that they are threatening them that if they continue to try and seek to vindicate that claim, they're going to be beaten again. That is all the jury had to find in order to return the verdict as to James Lee. The situation is similar with respect to Robert Roman. He, too, files a grievance in October 2008 alleging GDS hired in violation of the 2003 rule and asking to be made whole for wages and benefits due and very threatened to throw him out of the union for filing the grievance. Again, here, the threat that a reasonable jury could have understood this to be a threat, if you don't give up your right to this subset of wages to which you think you're entitled, I'm going to see to it that you don't earn any wages. And did Roman relent? Roman did not. But, again, he did not get thrown out of the union. I'm sorry, I probably should know the answer to this, but I don't, so maybe you can help me. Did any of these grievances go through all the process through arbitration? The grievances went up to the National Labor Relations Board, and the grievances were denied relief. Well, is that relevant? I don't believe it, John, and I don't believe there is a claim. It's not relevant that the grievances were denied? I don't think it is, John. Whether there was internal machinations around how the grievances were tried. If there was a charge filed before the National Labor Relations Board and it went through its process, there must have been some written documentation as to what the result was. Are you saying that we have to go behind that to find out if there were machinations? I'm saying that whatever the National Labor Relations Board may have decided as to the validity of these grievances, whether these victims actually had a bona fide claim under the 2003 rule, or whether Perry mishandled the grievance in one fashion or another, is not relevant. Again, we're dealing under the Haas Act, and the Haas Act has defined extortion. It has elements, and so the question is whether, with respect to London, for example, going back to where I was, did Perry, or could a reasonable jury have concluded? Is the answer to my question in the record? Is there an official document from the NLRB? I believe there is, and I don't recall exactly, but I believe it says that the grievances were denied. Okay. But again, we were going, Perry threatens Wellman. If you continue to try and vindicate your right to these wages, I'm going to throw you out of the union. And we know from Perry's ability to influence the hiring of GES that he had the ability to redirect wages that should have been Wellman's to others. Just like James Lee, the jury was permitted to draw. This is a reasonable inference that the jury was permitted to draw. Now, once those words came out of his mouth, then that's it. It's a jury issue. Absolutely. Because we know from context that he didn't need the consent or the acquiescence. We know that he didn't carry through on it, and we know that he didn't get any consent or acquiescence. Just uttering those words, that's what you think Congress had in mind when it passed the Hobbs Act. Well, Congress specifically in the Hobbs Act proscribed attempts to commit extortion. All the attempt requires, as the district court instructed in this case, there is no challenge to it, but I'm just going to take a substantial step toward the completion of the offense. And so when John Perry threatens Robert Wellman, I'm going to throw you out of the union, in other words, inflict economic harm on you, if you don't give up your property right to these future wages, he's preventing Wellman with a choice. Now, how does he do that? Is that what he said? It is what he said. I just want to make sure. Did he say, I'm going to throw you out of the union unless you give up your right for future wages? I believe the testimony was, I don't recall exactly the words that came out, but the threat was, I'm going to throw you out of the union. I know that, but do we know why he was threatening to throw him out of the union? I think this goes to whether there was a reasonable inference that Wellman was trying to get Wellman to do. Is there no more indication as to why he was threatening to do this than there was with respect to Perry and Lee? I believe that's right. I don't think there's direct testimony where it's a threat. Is it possible that it was retaliation for Wellman to be the threat and to get him to give up future? Possible? It's, yes, possible. I think, again, and I return to this because I think it is so critical that we are here on sufficient evidence. I just want to understand if there's anything beyond the sign that the word assault in one case threatened the other case. Because in both cases you don't have anything to indicate why it was being communicated. Well, don't I actually have something? In terms of, there are repeated phases in the record where Perry or the other fellow does make clear one thing they do want that they can't force on their own, but they want acquiescence, and that's political support within the union, not supporting dissidents lining up with them. Given that, doesn't that make it even more tenuous that what they were trying to do was get something that they already had and could do on their own? I don't think so, Your Honor, but there's no motive element to Hobbs Act. So one of Perry's ultimate motives here was to consolidate power. That wasn't an attempt. All that isn't an attempt, and this court's been clear, is a substantial step or an attempt to generate fear in the victim. Now, whether Perry attempts or not, wait, wait, wait, excuse me? For a purpose. To obtain power. But that's an attempt, isn't it? But whether Perry's ultimate goal here, I mean, I don't think there's any question that a reasonable jury could have concluded, as to James Lee, that the assault was intended as a threat. Give up your wages or else you're going to be beaten again. Now, whether Perry made that threat in an attempt to obtain his property because he cared about the wages or he cared about consolidating his power, again, the Hobbs Act had an element to it. The motive is not one of them. An attempt to generate fear in the victim to obtain property is all that the Hobbs Act requires. And that standard is, we think, amply satisfied by the evidence in the record, especially when viewed in the light most favorable to the verdict. Especially if I walk up to someone and say, I'm going to bop you on the nose unless you give me a dime. Would the Hobbs Act case that? Perhaps. I think as a matter of strictly looking at the elements of the offense, I think there's a fair question about whether that would be brought. But in terms of lining up the facts against the elements, perhaps that's the case. That is, of course, a very extreme case of a very minor threat for a very minor piece of property. This case is much more in the heartland of what the extortionate conduct is. Because I think this seems like even different than give up a dime. This is, I know you have a dime. Or actually, I know you might get a dime tomorrow. I hit you in the face. And a jury could reasonably conclude that was so that he would give me the dime that he's going to get in the future. Isn't that this case? I don't know. I could get the dime on my own. I don't think so. How is it different? This is a helpful hypothetical for me. How is this case different than the case in which I'm aware that tomorrow you might get a dime, and I've bumped into you, and a jury then concludes that must be because you were trying to induce fear in him so that if he got the dime tomorrow, he'd give it to me? I think it relates to the fact that the 2003 rule, the defendant's patient said there's an unenforceable sort of nothing of a provision. But it is, in fact, a contractual right that these members have, that Jean-Pierre negotiated on behalf of his union with GES. This gave them an enforceable right. Now, one can talk about exactly the extent of the right to be sure, but this is a contractual right to sorority that these members have. And again, going back to where I opened my remarks, in the union context, which is different than someone who has a dime in their pocket, in the union context, a union context, sorority and wages are tightly tied together. When you tinker with one, you tinker with the other. It's why these guys fought so hard to protect their rights. And again, it's the principle that the Supreme Court recognized and hopefully in the Second Circuit recognized and ruled. And going back to the discussion about Sicard and Zemeck, the futureness of the wages, if it works on the business side, as the Supreme Court appeared to suggest it did, then it seems by a matter of logical extension, it should work from the utility side. Do you agree Lee could not transfer his placement line to someone else? Just on that point. Do you agree that there's no evidence that Lee could have done that? On an evidentiary matter, I think I would, well, perhaps I would agree with that. As a theoretical matter of hausdacht extortion and obtaining, I think the place in mind is extortable. Your theory is that it's transferable in the sense that Perry could give it to someone else. That's right. But Lee could not give it to someone else. There were no evidence in the record to suggest that Lee could, but Lee cannot be extorted. But Perry could. Perry could give it because of the ample evidence in the record showing that Perry had substantial control over the hiring at GS. And perhaps it's useful to give some context to that. Are you talking about Signori? So Lee has rights under the 2003 rule to Signori, but perhaps this will be useful for answering Arne's question to give some context about exactly how workers were hired here, because it really would shine a spotlight to Arne's question about how Perry was able to do this. Spares were called into a hiring line for GS to make themselves available for work on a particular show, and when GS would then communicate to Perry the list of workers that GS wanted to hire. And in the documenting time that Perry was able to exercise his influence to tell GS from one user to another, this member can't work, this member can't work, can you work my family, can you work my friends? And we know from evidence in the record that GS's operations manager, for example, acceded to these demands in large part to sort of protect the peace between his company and the union. And so further points of evidence are GS was referred to as Perry's pet company, but GS Signori was referred to as the Perry List. There was testimony that anyone who knew anything about how the union operated at the time knew that the Perry's had influence over hiring of spares at GS. And so I think that goes to the attaining element, both as to Lee and Rone, and as to the vote. I see I only have six and a half minutes left, but I may put it to the other side of this case, the extortion of the union and hearing this is. We think that the dispositive point here is that the defendant's conduct in this case is materially indistinguishable from the conduct in Local 807 and from the conduct in Kimball. Indeed, Mr. Perry says in the reply brief that Kimball supports our position. In any case, the Supreme Court said that Kimball was a, quote, rather application of the Hawes Act. That is, we submit the end of the argument on this regard. In 807 and in Kimball, the defendants were using threats to obtain wages for work that needed to be done. In 807, it was driving trucks into and out of New York City. In Kimball, it was unloading the truck. These are services that actually need to be done. The employer's own employee was in the process of doing that. And then in Edmonds, the court said the Hawes Act was made specifically to reach that conduct in 807. And again, in Edmonds, the court said Kimball was properly decided under the Hawes Act. There is no difference between this case and those two cases in terms of the imposed unwanted and superfluous labor. How do you see the Hawes Act and the National Labor Relations Act integrating on this point? Because what I think we heard was an argument that there's a carve-out, a narrow carve-out for fed embedding defined with a focus on fictitious as opposed to redundant work. So it seems the argument is the NLRB implicitly allows a union, without violating the NLRB, to demand redundant work but not fictitious work. If that's a correct construction of the NLRB, then it would seem a little odd that we would then construe the Hawes Act to turn the carved-out redundant work into a crime. I think that's the argument we heard a few minutes ago. So the answer to your first question is the NLRB and Section 158 is all about, and Subsection D is about what constitutes an unfair labor practice for a union to engage in. Whether something is deemed unfair under the National Labor Relations Act doesn't really have anything to do with whether that conduct is criminal under the Hawes Act. Another important point here in this regard is Emmons was decided approximately 20 years after the Supreme Court decided Thornhill, which was the primary jurisdiction of the NLRB case. One would think that if Emmons thought that these cases were preempted for some reason, that Emmons would have said something about that. But Emmons didn't. Emmons said that it is an illegitimate labor union objective to use threats to obtain wages for imposed, unwanted, and superfluous services. And we know what imposed, unwanted, and superfluous services mean because of the way it has been discussed 807. How do we say it's illegitimate if we know Congress precisely decided not to include it in what's unfair for a union to do? It would seem odd to then say that's illegitimate. Well, there's a couple of answers to this question. Again, whether something is deemed an unfair labor practice means really that a, for example, an employer can't bring a civil complaint or claim for injunctive relief against the union. It doesn't mean that what these unions are doing, what these individual members are doing, are violating federal criminal law. I thought there was a provision in the Hawes Act they were telling us that specifically references the NLRB. It does, but all it does is say the Hawes Act does not mention the repeal or amend the National Labor Relations Act. That means those actions that we're talking about are legal under the National Labor Relations Act as amended. Well, I don't know if that's true, Narayan, but there is a section, it's 158b4d, which talks about threats to coercion in order to hire one group of employees over another. I don't want to suggest to the court that the court has to resolve whether this is an unfair labor practice. I think, and to your level, the court said that prevention applies only if the court has to resolve the unfair labor practice question in order to resolve the underlying case. If I understand your theory, that provision, which says nothing in the Hawes Act repeals or amends, is perfectly superfluous. You keep saying that criminal activity is different than the NLRB because that's not criminal. Since the Hawes Act is a criminal statute, obviously it doesn't amend or repeal it. I think that's right. So you just think there was no reason to put that in? No, I don't think that, Narayan. Then what was the reason to put it in? Well, because there was substantial debate around the passage of the Hawes Act about whether it would reach, for example, conduct in connection with strikes. You just wrote that conduct was only regulated by civil statute and the Hawes Act is only a criminal statute. When you say reach, that's the whole point, is that some activity that Congress was regulating through the NLRB, it looks like they were worried about the Hawes Act then manifesting a distinct policy that might interfere with the policy about what kind of conduct unions and employees can engage in with respect to labor-management relations. I don't know that I would exactly agree with that, Your Honor. In eminence, the dissenting opinion in eminence references the fact that Congress specifically rejected an affirmative defense under the NLRA to a Hawes Act prosecution. And again, if this case is preempted, it will return us to a world where the conduct in Article 807 is also preempted. That's impossible to square with everything the Supreme Court has said with perhaps uncommon clarity about just how specific Congress was in its intent to overturn the result in Article 807 by passing the Hawes Act. Would you say that picketing or fleeing to picket, unless your employees are union employees, is illegal? Threatening, picketing depends on the objective of the picketing. I just told you what the objective was. I don't think I heard. What was the objective, Your Honor, specifically? Picketing to have the employees substituted by union employees or have them join the union. Having them join the union would be perhaps a form of recognition picketing. There's a complicated body of law around recognition picketing. I think there is standards picketing, but the purpose of the picketing here is to try and publicize to the community that the employer is paying below scale. How about substituting? You've got a bunch of employees, and I'm now picketing because I'd like you to replace those employees with union workers. That's a Hoback violation. I believe that's right. Even though you agree it's permissible under the NRA and not an unfair labor practice. Well, I don't know that I would agree with the second part of that. I'm willing to take a vision of the Hoback violation, even if it's clear that under the NRA it's not an unfair labor practice. In other words, we shouldn't worry about that. Whether it is or not, therefore we can just assume it's an unfair labor practice. It's criminal under the Hoback. Perhaps that's a way of looking at it. I don't dispute that there are perhaps complicated questions around the intersection of these statutes, but what I think is dispositive of the defendant's argument here, again, is in these cases, they distinguished between two cases that the Supreme Court said reflect proper applications of the Hobbs Act. That, I think, is the Supreme Court's word, the most recent word on this issue, and I think that resolves the defendant's challenge to the evidence and the juror's instructions on these counts. Is this conversation, the Hobbs conversation we're having, is it irrelevant to the four points event in terms of, well, could you just clarify for me the evidence there? Was the evidence there simply that the employer cut a check and they left and didn't do any work? That is what happened. That happened several times at four points. That's not the only evidence in connection with four points. So, in that, if I'm understanding it, you were meaning to mean the superfluous versus fictitious point. It was no work at all. They did not do any work in any of these instances. Is that the only case like that? There was one other count. Let's see. If I look here, I'll be able to find it. It was the Great Battle of Western California, where they did some minimal amount of work. It doesn't mean they worked to an extent. When there was something heavy to push, they had their hands on it. I think there's not a sufficient basis in the record to say they didn't work on these other counts. If I may make one final point. Are you familiar with the American newspaper publisher's case that has been mentioned here? I'm more familiar with the case that the defendant cited, which is Gamble. But I'm familiar with the principal, yes. Well, in that case, actually, federal vetting was found out to be a violation.  The federal vet that demands for the work that the theater employers didn't need was not an unfair labor practice. Is that relevant to this case? I don't believe it is, Your Honor. Why do you not believe it's relevant? Because I think the Supreme Court has told us it's not relevant. In Green, for example, the judicial court relied on the Gamble case to say that the conduct in Green was not subject to prosecution under the Hobbs Act. And the Supreme Court said that that was an incorrect interpretation of the statute, that nothing in the NLRA protects threats to obtaining personal property. And I think that will get carried through later on in Edmonds when Edmonds cites with St. Philip in the 807 and Gamble without so much as even having to reference any possibility that those prosecutions were preempted. If I may, I'm running over time, so let me make one final point. I'm telling you now, he has three minutes and 49 seconds. Okay, thank you. The final point... Oh, I'm sorry, I didn't know. That's all right. The one final point I want to make is that on the exclusion of the non-union business society, there was sufficient evidence in the record on all of these counts, and we lay it out for the court, that these defendants were at the very least intending to threaten their victims with physical harm if they didn't accede to the demands of the union. So I don't think it's right to say this is an economic threat-only case. I don't think it's right on the basis of the evidence, especially with the shooting of light most favorable to the verdict, to consider this as a picketing-only case in every count where there's sufficient evidence from which the jury could have found threats of physical harm. With that, if the court has no further questions, we will rest on our brace. Thank you. Thank you. Mr. Schneider, I think you have some time. If I may, Your Honor, I think I'm inclined to rest on my brace, unless the court has any questions. It doesn't matter to whom, but could you just say something about Kemble? Yes. I have to say I think that my reference in a footnote to Kemble was mistaken, but I think Kemble is very much distinguishable. And first of all, if you read any of the discussion of Kemble's closely, they make it clear that the Third Circuit was limiting its holding in that case very narrowly to the facts, and that the evidence court clearly thought that Kemble was very narrowly limited to the facts. But the other point that I would make about Kemble, I think I said it in my initial remarks, is that the Third Circuit found in Kemble that there was obstructing violence, that actually the business agent in that case prevented the non-union trucker from unloading the truck. So I think, as I say, I think that makes it categorically different than using a threat of picketing. The union members never had an opportunity to perform any work. There was no actual work performed. The issue was addressed squarely in American newspaper publishing, and Kemble was simply not addressed. So I think that is critical. It is true that I made a reference in one of my footnotes suggesting that Kemble may have gone the government's way, and I would have to say that I would withdraw that point. I think I made a mistake there. I think Kemble is distinguishable. And I think Local 807 as well. He also involved violence and also, as the court noted in Edmonds, that that too involved union truckers who, after receiving the full day's wage, then some of whom simply drove off. So I think that was the issue there. I think the gist of Edmonds really was the Supreme Court saying to the government that the Hobbs Act cannot interfere in, more broadly, the internal affairs of the union, internal labor management affairs, when labor objectives may be at stake. One other point that I would want to make, I think your honors have assessed the Lee and Wellman situations correctly. The only thing that I would want to say about that is there was no evidence that Terry told GES not to hire Lee going forward. I have some details in my opening brief about that. What does that matter? Well, I'm not sure that it does, but it was just a comment that was made when I first heard about the argument that, okay, maybe he didn't get anything, but he attempted extortion. Well, again, as I indicated in my reply, I do think that the government's reading of what occurred is a really tortured reading that tries to turn into something that really doesn't fit the template for what extortion is. Extortion is a threat. I am going to do X if you don't agree to do Y. And that Y has to be something that has the working feel of paying me some money, giving me some kind of tangible or very clearly monetizable property right, but not the kind of feeling like some abstract possible opportunity for a place in the hiring lines. Thank you. Thank you. Mr. Conrad? Thank you. First, very briefly, I just want to note there was some discussion during our initial argument, so I guess this isn't really vital, but in terms of a record citation about the response to the question about the jury questions about what was superfluous, et cetera, and what would happen if someone was fired. Mr. Perry's reply brief in the addendum, supplement addendum, starting at page 4 and going forward, there is a portion of the transcript in which there was lengthy discussion about what the court should say in response to these questions, including a lengthy discussion of the Gamble case, and ultimately the district court simply referred the jury back to its initial instructions. I would note that the government also during that discussion said, well, they should just use their common sense as to what unnecessary, superfluous, and unwanted means, which, of course, is the crux of the problem in this case on this appeal. I would like to turn to Four Pines since that came up at the end. Four Pines, I agree, is a little different from the others, but I think it's different in ways that, nevertheless, demonstrate that the evidence is insufficient to sustain the conviction. First of all, in Four Pines, there were three owners of the company. They didn't have any employees. There were just the three owners. Two of the three testified. The two of the three were not the ones who made whatever arrangement they allegedly made with Mr. Brown. All of them were permitted to testify with about hearsay about their understanding of what the arrangement was and why or how it was made. It was very unclear whether that was admitted to the truth of the matter. Second, there was no actual evidence that it was said, if you don't hire Teamsters or if you don't pay us, we will pick it. There was no evidence of a threat. There was fear on the part of Conor Brennan, who testified, that there was going to be a ticket if he didn't hire them. They did testify, Sean Rich testified, and this can be found at Volume 4 of the Joint Appendix, pages 423 to 424, they showed up to work and they offered to work. If we hadn't had volunteers, there would have been work. So this is not a situation where they had hired people. They were trying to get by on free labor or whatever the cost of the beer and the T-shirts and the food was. And they made themselves available to work, which is, I think, the crucial distinction. Now, in general, I think it's important to note that there is quite a vigorous dispute between the various opinions, and I think it's an en banc decision, so there are several opinions. There's a majority opinion, there's concurring, there's dissenting, about whether or not these were payoffs or whether or not this was an attempt to gain work. And the two sides go back and forth about what the nature of the evidence in that case was. And again, I think it's important to remember that in Edmonds, Edmonds was not addressing, as the government would have it, the question of whether or not it is extortion to seek payment or to seek to be hired for unwanted, unnecessary, or superfluous work. Edmonds was a case about the use of violence in the course of a strike, and it gave this as examples of conduct that the Hobbes Act could or didn't reach. We also cited in our brief the case United States v. Congress, which the government ignores, which is in Edmonds, which says that the Hobbes Act protects union activity directed toward legitimate labor goals, even when militantly pursued. And I would submit to you that, arguably, maybe that's what we have at issue here, but I think the major distinction between Green, Campbell, Local 807, and this case, is the absence of any threat to violence. And that brings in the state of mind requirement for Stone, but it also explains why there was no lengthy discussion in Edmonds of 1951c. Because the National Labor Relations Act does not address violence. It addresses packets. There are provisions of that act that have violence. And we call it AB1A or B. I may be mistaken, Your Honor, but I think that the fact that there would not necessarily be the type of conduct that one would normally consider punishable under criminal statute. That's a different story. As opposed to under, protected by the National Labor Relations Act, I think provides a different perspective. So in a way, it's really sort of the Supreme Court reaching out and saying, look, even if there's violence, we're going to leave that to the states. You can prosecute that in state court. You can prosecute the chest bump in state court. All of these things were, at one point, brought into the state court, but ultimately dismissed. Thank you very much. Thank you. Order 15-2250, level number 8, IBEW's Plan and Trust, the Vertex Pharmaceutical State. Thank you, Your Honor.